IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **THOMAS E. PEREZ, Secretary of Labor**<br>United States Department of Labor<br>200 Constitution Avenue, NW<br>Room N-4611<br>Washington, DC 20210<br><br>**Plaintiff,**<br><br>v.<br><br>**ROBERT L. ROACH, JR.**<br>5204 Kenstan Dr.<br>Temple Hills, MD 20748<br><br>**WARREN L. MART**<br>655 Maybrook Dr.<br>Huntingtown, MD 20639-3923<br><br>**BURTON C. TREBOUR**<br>53 Fairway Blvd.<br>Jamesburg, NJ 08831-2711<br><br>**ALFRED C. NELSON**<br>2550 Blue Ridge Ave.<br>Cocoa, FL 32926-7405<br><br>**LYNN D. TUCKER, JR.**<br>6646 Fountains Blvd. Apt. 11<br>West Chester, OH 45069-6112<br><br>**PHILIP J. GRUBER**<br>12922 Tipperary Lane<br>Plainfield, IL 60585-2835 | Civil Action No. |

**GARY R. ALLEN**
189 Oxleigh Way
Folsom, CA 95630-8410

**ROBERT G. MARTINEZ, JR.**
7817 Bursey Ct.
North Richland Hills, TX 76182-8731

**THOMAS W. CONNERY**
23 Applethorn Ct.
Colts Neck, NJ 07722-2016

and

**THE NATIONAL PENSION PLAN A/K/A THE IAM
NATIONAL PENSION FUND**
1300 CONNECTICUT AVE., N.W., SUITE 300
WASHINGTON, D.C. 20036

**Defendants.**

_____

## COMPLAINT FOR ERISA VIOLATIONS

Plaintiff Thomas E. Perez, Secretary of the United States Department of Labor

(the "Secretary"), alleges:

1.      This action is filed under the Employee Retirement Income Security Act

of 1974 ("ERISA"), as amended, 29 U.S.C. §§ 1001, et seq., against fiduciaries to the

National Pension Plan a/k/a the IAM National Pension Fund ("the Fund"), an ERISA-

covered plan for members of the International Association of Machinists & Aerospace

Workers (the "Union").

2.      Defendants Robert L. Roach, Jr.; Warren L. Mart; Burton C. Trebour;

Alfred C. Nelson; Lynn D. Tucker, Jr.; Philip J. Gruber;  Gary R. Allen; Robert G.

Martinez, Jr.; Thomas W. Connery (hereinafter collectively referred to as the "Trustees")

2

are present and past trustees of the Fund.  The Trustees, among other things, failed to loyally and prudently select the Fund's service providers, routinely ignored required procedures written in the Fund's governing plan documents, created conflicts of interest, unlawfully solicited and accepted gratuities from service providers, spent and permitted others to spend Fund assets lavishly on unnecessary trips, parties, and inordinately expensive food and wine, failed to prudently, and loyally monitor and control Fund costs, and generally engaged in a pattern of conduct in which they disregarded their fiduciary duties.

3.      By these actions and others, the Defendants failed to protect the interests of the Fund and its participants and beneficiaries.  Each Defendant committed violations, or knowingly participated in violations, of ERISA's fundamental fiduciary duties of loyalty and prudence.  In doing so, the Defendants violated their fiduciary duties of loyalty and prudence and deliberately failed to follow the Fund's governing documents, in violation of ERISA §§ 404(a)(1)(A), (B), and (D), 29 U.S.C. §§ 1104(a)(1)(A), (B), and (D), and engaged in prohibited transactions in violation of ERISA §§ 406(b)(1), (2) and (3), 29 U.S.C. §§ 1106 (b)(1), (2) and (3).

## JURISDICTION AND VENUE

4.      This action arises under ERISA and is brought by the Secretary to obtain relief under ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132, to redress violations and enforce the provisions of Title I of ERISA.

5.      This Court has subject matter jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

3

6.     Venue with respect to this action lies in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

## PARTIES

7.     The Secretary, pursuant to ERISA §§ 502(a)(2) and (5), 29 U.S.C. §§ 1132(a)(2) and (5), has the authority to enforce the provisions of Title I of ERISA by, among other means, filing and prosecuting claims against fiduciaries who breach their duties under Title I of ERISA.

8.     Robert Roach, at relevant times, was a Fund Trustee and Co-chair of the Board of Trustees and a member of the Fund's Investment Committee. As such, Roach was a fiduciary to the Fund under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and party in interest to the Fund under ERISA § 3(14), 29 § 1002(14)(A).

9.     Warren Mart and Burton Trebour, at relevant times, were Fund Trustees and Co-chairs of the Board of Trustees, and also members of the Fund's Investment Committee. As such, Mart and Trebour were fiduciaries to the Fund under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and parties in interest to the Fund under ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A).

10.     Alfred Nelson, Lynn Tucker, Philip Gruber, Gary Allen, Robert Martinez, and Thomas Connery at relevant times, were Trustees of the Fund and, as such, were fiduciaries to the Fund under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), and parties in interest to the Fund under ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A). Collectively, these individuals, with Roach, Mart and Trebour, are referred to as the "Trustees."

4

11.     The Fund is an employee benefit plan as defined by ERISA § 3(3), 29 U.S.C. § 1002(3), and is subject to ERISA pursuant to ERISA § 4(a)(1), 29 U.S.C § 1003(a)(1).  The Fund is administered in the District of Columbia and is joined as a party defendant pursuant to Rule 19(a) of the Fed. R. Civ. P. solely to ensure that complete relief can be granted.

## GENERAL ALLEGATIONS

**The Fund**

12.     The Fund is a Taft-Hartley, multi-employer, defined benefit pension plan for the benefit of the members of the Union and their beneficiaries.  It is governed by the IAM National Pension Fund Amended and Restated Agreement and Declaration of Trust ("Trust Agreement").

13.     The Fund, at relevant times, was controlled by a Board of Trustees and an Investment Committee.  The Board of Trustees is the Plan Sponsor and Plan Administrator, and the Trustees are named fiduciaries under ERISA.  The Trust Agreement states that the Trustees "shall meet at least once a year and at such other times as they deem it necessary to transact their business."  The Board of Trustees set the location of their meetings.

14.     The Investment Committee, at relevant times, oversaw the Fund's investment program.  The Investment Committee, consisting of the two Co-chairmen of the Board of Trustees, Trebour and Mart, and, subsequently Trebour and Roach, had the discretion to exercise the authority of the Trustees under the Trust Agreement, including hiring and firing investment managers and investment consultants.  Investment

Committee meetings occurred twice a year.  The Board of Trustees ratified or could retroactively change the actions of the Investment Committee.

**The Fund's Service Providers**

15.    For approximately thirty years beginning in the early 1980's, the Fund used two investment consultants: Segal Advisors, Inc. ("Segal") and Meketa Investment Group ("Meketa").

16.    Segal Advisors conducted investment manager searches and due diligence reviews for the Fund.

17.    During that time, Meketa performed asset allocation reviews, monitoring, and reviews of investment managers, made recommendations regarding investment managers and asset allocations, and authored the Fund's Five Year Strategic Investment Plans.

18.    Beginning in approximately 1998, KRA Capital Management ("KRA") was the Fund's domestic REIT (Real Estate Investment Trust) investment manager.  KRA was a two-person investment company, whose only two clients were the Fund and the IAM Grand Lodge Plan.

19.    On January 27, 2004,  Trustees Trebour and Mart hired Amalgamated Bank as a Qualified Professional Asset Manager ("QPAM") and investment manager of the IAM Private Equity, LLC , the entity the Fund established to house its private equity and other private investments (hereinafter, "Private Markets portfolio").  On January 30, 2004, Amalgamated contracted with Meketa to act as its sub-advisor for the Fund's Private Markets portfolio.

20.     On April 10, 2010, Trustees Trebour and Mart executed an Investment Manager Agreement with Meketa, to become investment manager of the Private Markets portfolio, thereby eliminating Amalgamated in that role.  The Board of Trustees ratified the Investment Committee's action.

21.     On May 28, 2010, Trustees Trebour and Mart executed a contract with Cliffwater, LLC to act as investment manager of the Fund's hedge fund portfolio.  The Board of Trustees ratified the Investment Committee's action.

**Imprudent Hiring of Graystone Consulting**

22.     Effective September 1, 2013, after a lengthy process involving two separate candidate reviews that both concluded that Graystone Consulting ("Graystone") was an inferior candidate, the Fund retained Graystone to serve as its investment consultant.

23.     In hiring Graystone, the Trustees disregarded Fund procedures, ignored their specially hired consultant's prudent recommendation, chose Graystone even though it had not been recommended by their consultant, and paid Graystone's higher fees, without any prudent process or basis for doing so.  As a result, the Fund expended approximately $125,000 more in fees per year for Graystone than the highest fee candidate recommended by the Trustees consultant.  The record demonstrates that the Trustees' decision was not supported by any prudent analysis, let alone any analysis justifying paying Graystone's higher fees for the services offered.

24.     Graystone was hired despite the disapproval of both the Fund's Chief Investment Officer ("CIO") and an outside consulting firm that was retained by the Fund specifically to review and supplement the CIO's extensive search and to recommend an investment consultant for the Fund.

25.    In the early part of 2012, the Trustees instructed the Fund's investment staff to undertake a search for an investment consultant.  On May 22, 2012, Monte Tarbox ("Tarbox"), who was then the CIO for the Fund, advised the Board that a Request for Proposals ("RFP") was being issued with the goal of hiring a General Investment Consultant for the Fund.  Twelve firms were identified as potential consultants and the RFP was distributed to those firms by email between June 1 and June 4, 2012.  All twelve candidates responded by the June 28, 2012 deadline.

26.    Tarbox and his staff completed their search and analysis of the original twelve firms and, in a memorandum dated August 14, 2012, presented their findings to Trustees Roach and Trebour, who constituted the Fund's Investment Committee and were Co-chairs of the Board of Trustees on that date.

27.    In reviewing the candidates, Tarbox and his staff used 13 criteria, including:

  a.  Experience and expertise of consultants assigned to the Fund;

  b.  Ability to communicate difficult financial topics;

  c.  Firm's experience with private assets and hedge funds;

  d.  Independence of the firm and impact of any affiliated company relationships;

  e.  Organizational stability, ownership broadly shared, succession plan in place;

  f.  Stable senior staff;

  g.  Depth of the team dedicated to research and manager analysis;

  h.  Sophisticated client base;

  i.  Clarity and sophistication of performance reports;

j.  Analytical strength of underlying performance report;

k.  Risk Measurement capabilities;

l.  Insight demonstrated in asset allocation, manager search, and other reports;

m.  Evidence of innovative advice and thought leadership.

28.     Applying the criteria in paragraph [26], Tarbox and his staff assigned each candidate a numeric rating ranging from the lowest score of 39 points to the highest score of 57 points.  Of the twelve firms, Graystone was ranked ninth, receiving the fourth lowest total score of 46 points.  When Tarbox presented the findings to the Board, he expressed his opinion that Graystone was one of the least qualified firms.

29.     Despite Graystone's low score and Tarbox's personal disapproval, the Board requested reference checks of the four firms receiving the top four scores and Graystone.  Tarbox and his staff conducted the reference checks requested by the Board.

30.     The August 14, 2012 memorandum from Tarbox and his staff also recommended that the Trustees retain an independent firm to review the RFP responses and to offer its own advice to the Trustees about the selection of a consultant.

31.     On October 1, 2012, the Fund engaged Gallagher Fiduciary Advisors, LLC ("Gallagher") to advise the Trustees and assist with respect to the selection of an investment consultant for the Fund.  Gallagher was first contacted to discuss the assignment within two weeks of Tarbox submitting the August 14, 2012 report. Gallagher received and reviewed the RFP submissions from all of the candidates on Tarbox's list.  Gallagher was instructed by or on behalf of the Board to start fresh with its own analysis.

32.     The agreement between Gallagher and the Fund provided that Gallagher was to serve as an independent expert hired to "independently evaluate all proposals, rank the top candidates . . . and arrive at a list of at least three finalists."  Gallagher was also to "personally interview at least three finalists," and "attend a meeting at which finalist candidates personally present their proposal to the Board of Trustees, assist in the Board's deliberations and make recommendations as requested."

33.     In October 2012, pursuant to its agreement with the Fund, Gallagher made a presentation to the Board detailing its search process and criteria.  During the presentation, Gallagher specifically noted that it would interview four to five candidates in early to mid-November 2012 and present three finalists to the Board in or about the first week of December 2012.

34.     Gallagher did not have the Tarbox candidates issue new response packages, but did ask supplemental questions of the candidates and inquired about substantive changes to the firms from the time of each firm's original submission. Gallagher also invited two additional firms to submit proposals, but both firms declined because of pre-existing relationships with the Fund.

35.     Beginning in October 2012, Gallagher reviewed the documents received from the Tarbox review and the supplemental materials forwarded by the candidates, had several face-to-face meetings with candidates, and spoke with Fund counsel, Trustees and staff.

36.     On December 14, 2012, Gallagher met with the Board and made a presentation regarding a list of five semi-finalists it had selected.  Graystone was not among the five semi-finalists.  While the list contained five firms, Gallagher's

presentation noted that one of the five semi-finalists had been eliminated after Gallagher's face-to-face interviews were conducted.  Following Gallagher's presentation, each of the semi-finalists presented its consulting proposal to the Board.

37.    During the December 14 presentation, Gallagher informed the Board that Graystone was among the bottom five firms that were eliminated from consideration after Gallagher's initial review.  Among Gallagher's concerns about Graystone were (i) many regional offices creates risk of inconsistent advice across client base; (ii) business model entails numerous potential conflicts which the Fund could be required to monitor; (iii) poor performance of active investment managers; (iv) loss of client base; (v) high fees; (vi) disappointing returns experienced with another multi-billion dollar defined benefit plan; and (vii) limited experience with large plans.

38.    Following Gallagher's presentation at the December 14 meeting, Gallagher was questioned by the Trustees as to why Graystone had been excluded from the list of semi-finalists.  In response Gallagher again stated the concerns set forth in its presentation.  Gallagher highlighted the potential institutional-related conflicts, Graystone's poor selection of investment managers and Graystone's high fees.

39.    At the end of the December 14 meeting, the Trustees unanimously passed a motion directing Gallagher, among other things, to conduct the same due diligence on Graystone that it did on the five semi-finalist candidates (e.g. additional written questions, in-person interview in Gallagher's offices, etc.) and schedule a Board-level interview for Graystone with the Trustees.

40.    As directed by the Board, Gallagher added Graystone to the interview process and conducted an interview of John Granger of Graystone.

41.     The Board did not express interest in any other candidate that had not qualified as a semi-finalist.

42.     On January 23, 2013, the Trustees convened a meeting for an updated presentation from Gallagher and a formal presentation from Graystone.  Co-chairman Roach, attended Gallagher's October 2012 presentation where Gallagher made clear that only 4-5 finalists would be interviewed by Gallagher.  Nevertheless, Roach stated during the January 23 meeting that "all candidates should have been given the opportunity to meet with Gallagher."  Graystone was the only candidate not in the semi-finalist list that the Board insisted be interviewed by both Gallagher and the Board.

43.     At the January 23 meeting, Gallagher provided an updated semi-finalist list, which had now been pared down to three of the original five semi-finalists and Graystone.  Gallagher's updated report noted that Graystone was added at the insistence of the Trustees and Gallagher repeated some or all of its concerns about Graystone's qualifications.

44.     Following Gallagher's updated presentation at the January 23 meeting, Graystone made its formal presentation to the Board.

45.     From January to March 2013, Gallagher continued to advise the Fund in connection with the RFP process and the search for an outside investment consultant.  During that time, Gallagher selected the finalists that would make presentations to Board.  This list included three of the original semi-finalists and Graystone.  Graystone was included at the insistence of the Board and over Gallagher's objection.  On March 8, 2013, the Board met with Gallagher, Graystone, and NEPC, Marquette & Associates, and Wurts & Associates, the other three finalists.

46.     The fee bids for the final four on March 8, 2013 were:

| | |
|---|---|
| NEPC | $400,000 |
| Marquette & Associates | $450,000 |
| Wurts & Associates | $775,000 |
| Graystone | $1,100,000 |

47.     Before the conclusion of the March 8 meeting, the Board selected Wurts and Graystone as the two finalists.

48.     Between March and June 2013, discussions continued among the Board, Gallagher and the finalists, Wurts and Graystone.  On May 22, 2013, Graystone adjusted its fee bid down to $900,000, while Wurts remained $125,000 lower at $775,000.

49.     At a meeting of the Board, on June 3, 2013, the Board selected Graystone as the new General Investment Consultant.  A majority of six Trustees, including Roach, Gruber, Tucker, Martinez, Allen and Connery voted in favor of hiring Graystone. Trustees Trebour, Henry Eickelberg and Tawfiq Popatia voted against hiring Graystone. Trustee Nelson abstained from the vote.

50.     The minutes of that meeting disclose that the Board discussed a personal relationship between IAM President R. Thomas Buffenbarger and J.Weldon Granger, who is the father of John Granger, the Graystone representative who manages the Fund's account.  J.Weldon Granger and his firm are currently one of the recommended counsels on [www.goiam.org](www.goiam.org), the Union's website.

51.     The minutes do not discuss the relative merits of Graystone over any other candidate other than non-specific comments by Roach regarding being able to trust the service provider.  There is nothing in the minutes discussing why the Board could not

trust Wurts, or any of the other finalists, or the advice of its CIO Monte Tarbox, or its

paid professional consultant Gallagher.  Nor is there anything in the Board minutes

addressing the specific concerns about Graystone that were raised by Gallagher in the

reports it was hired to produce.

52.     Sometime in mid-July 2013, the Fund's agreement with Gallagher was

amended to compensate Gallagher for the extra research and interviews the Trustees

insisted Gallagher complete in connection with adding Graystone first as a semi-finalist

and then a finalist.  The amendment provided that the Fund would pay Gallagher $20,000

in addition to the initial $40,000 fee.

**Additional Imprudent and Improper Hiring Practices**

53.     For over thirty years, the Investment Committee used a consultant to

conduct a search for qualified investment managers, vet the candidates, and narrow the

field of candidates.  The narrowed list of candidates was presented to the Investment

Committee, which selected the candidate to hire.  The Board of Trustees later ratified the

hiring decision.  This approach was set forth in the Fund's governing documents and used

when new asset classes were recommended and when investment managers were

terminated.

54.     The Fund's Manager Monitoring Policy, dated March 22, 2005, states that

the Trustees are responsible for selecting investment managers and that there are three

steps which must be followed in selecting a new investment manager: 1) Defining a Role

– managers can be hired to fulfill a new role or replace an incompetent manager; 2)

Conducting a Search – Trustees will hire an investment consultant to conduct a search,

the consultant will disclose any potential conflicts of interest before performing the

search, and the consultant is expected to provide the Trustees with a list of recommended investment managers; and 3) Selecting a Manager – Trustees are responsible for selection.  The Fund's Policy was not followed in the hiring of three of the Fund's service providers, Meketa, KRA and Cliffwater.

55.     The Trustees and Board did not use a prudent process in hiring certain of the Fund's service providers, including not following the procedures set forth in the Fund's Manager Monitoring Policy, dated March 22, 2005.  In hiring Meketa, KRA, and Cliffwater, there was no search or bidding process.  The Investment Committee considered only a single investment manager candidate, retained Segal Advisors to conduct a due diligence review on the one candidate, and then approved the hire.  The Trustees and Board also failed to conduct an analysis or review whether the fees charged by these service providers were reasonable.  The Board of Trustees, at a later date, ratified the Investment Committee's hiring decisions.  This method of hiring was not authorized by any Fund policy or other Fund document.

**Meketa's Expanded Role with the Fund**

56.     From February 2004 until in or about April 2010, Meketa acted as sub-advisor to Amalgamated Bank, the Fund's QPAM and investment manager of the IAM Private Equity, LLC, the entity the Fund established to house its Private Markets portfolio.

### The 2008 Strategic Investment Plan Recommendations

57.     As part of its investment consultant role with the Fund, Meketa prepared the Fund's 2008-2012 Strategic Investment Plan ("2008 Investment Plan").  The 2008 Investment Plan included, among other things, a recommendation that the Fund hire a

second QPAM.  The 2008 Investment Plan was submitted to and approved by the
Investment Committee in or about April 2008.

### Segal Advisors' Due Diligence Reviews

58.     To implement the 2008 Investment Plan recommendation to hire a second
QPAM, the Investment Committee (Trebour and Mart), in 2009, retained Segal Advisors
to conduct a due diligence review on Cliffwater LLC's ability to serve as a QPAM for the
Fund. The Investment Committee did not follow the procedures set forth in the Manager
Monitoring Policy for hiring investment managers.

59.     On September 18, 2009, the Investment Committee received Segal
Advisors' due diligence report concluding that Cliffwater could serve as a QPAM.

60.     On September 22, 2009, Mary Cusick, the Fund's Chief Investment Officer,
notified members of the Fund's investment team that Trustee and Investment Committee
member Mart did not want Cliffwater for the second QPAM and investment manager
role.  Instead, Mart wanted the Fund to replace Amalgamated with Meketa as the Private
Markets portfolio QPAM and not hire a second QPAM.

61.     On December 11, 2009, Toby Thompson, a member of the Fund's
investment team, requested that Segal Advisors prepare a due diligence report on
Meketa's qualifications as the Private Markets Investment Manager/QPAM.

62.     Thompson also requested that Segal Advisors negotiate a fee with Meketa
and conduct monitoring of Meketa as Investment Manager/QPAM of the Private Markets
portfolio for additional compensation to Segal Advisors.

63.     At the time Thompson contacted Segal Advisors to prepare a diligence
report on Meketa, the Fund, the Investment Committee and the Trustees knew that hiring

Mekata as Investment Manager/QPAM of the Private Markets portfolio would create multiple conflicts given Meketa's many roles with the Fund.

64.     As a result of the conflicts created by the Investment Committee and the Trustees' hiring of Meketa as investment manager for the Private Markets portfolio, it was necessary for the Fund to hire a firm to monitor Meketa in this role at an additional cost to the Fund.  This additional cost would not have been necessary if the Trustees had hired someone other than Meketa as investment manager for the Private Markets portfolio.

65.     On January 20, 2010, Segal Advisors submitted a proposal to the Fund for conducting a due diligence review of Meketa, negotiating a fee with Meketa, and monitoring Meketa as Investment Manager/QPAM of the Private Markets portfolio on an ongoing basis.  Segal Advisors quoted a fee of $20,000 to conduct the due diligence review and fee negotiation, and $470,000 a year to monitor Meketa.  If Meketa were hired, Segal Advisors would gain this additional $470,000 in compensation and the Investment Committee and Trustees knew or should have known about this conflict of interest that they created.

66.     The Investment Committee approved the proposal on or about January 26, 2010, without an analysis of the reasonableness of Segal Advisors' proposed fees or whether it was appropriate to have Segal Advisors perform this dual role where if it approved the selection of Meketa, it gained additional fees for monitoring Meketa.

67.     Mart and Trebour executed an Investment Manager Agreement with Meketa on April 10, 2010.  It rolled into a single retainer agreement Meketa's investment management role for the Private Markets portfolio and Meketa's work under the

Consulting Agreement (assistance in developing investment policy statements, assistance in developing investment guidelines, annual reviews, monitoring performance, asset allocation study and reviews, investment manager searches, and five year Strategic Investment Plans).  The Agreement granted Meketa discretionary authority over Fund assets, and Meketa acknowledged that it was a fiduciary to the Fund.

68.     Amalgamated was terminated as QPAM of the Private Markets portfolio.

69.     Segal Advisors received $470,000 per year to monitor Meketa.  Neither the Fund staff, nor the Investment Committee, nor the Trustees conducted an analysis regarding the reasonableness of the fees that they determined to pay Segal Advisors.

70.     The Board of Trustees unanimously ratified the Investment Committee's hiring of Meketa and Segal Advisors.  When hiring Meketa as an investment manager, the Investment Committee and Board of Trustees did not use a prudent process, including not following the procedures set forth in the Fund's Manager Monitoring Policy for hiring investment managers.

71.     Moreover, the Trustees never met with Segal Advisors or discussed any of its opinions or due diligence before they ratified the Investment Committee's decision to hire Meketa.  Nor did they question Mart and Trebour as to what process they used before hiring Meketa.  The Board was provided only with Segal Advisors' March 18, 2010 due diligence memorandum.  The Board was neither provided with Segal Advisors' March 1, 2010 draft due diligence memorandum, which included Segal Advisors' areas of concern, nor informed that drafts had been shared with the Fund's staff and that changes had been made to the March 1 draft.   The Board did not question or discuss the March 18 memorandum with Segal Advisors.

**Trustees' Imprudent and Improper Expenditures of Fund Assets**

72.     The Trustees caused the Fund to pay for unnecessary, lavish parties and

dinners for its Trustees and service providers as well as trips for Board meetings.  For

example:

- An October 3, 2011 dinner paid for by the Fund featured bottles of wine priced as high as $1,185, and included Trebour, six Fund staff members, and two service providers.

- On March 14, 2011, the Fund paid a $1,954.39 Investment Committee (Mart and Trebour) dinner bill, including two bottles of wine at $125 a bottle and two bottles of wine costing $375 a bottle.

- The Fund paid in excess of $90,000 for two Fund holiday parties, one in 2009 and one in 2010.

- The Fund paid $2,680.23 for a retirement party for a Fund Employee on August 13, 2008.

73.     The Fund's Amended and Restated Trust Agreement grants the Trustees

the power and authority to pay "reasonable and necessary expenses."  Under the Fund's

Investment Policy Statements, the Trustees were to monitor and control operating costs

"at every level" of the Fund.

74.     The Board of Trustees also scheduled quarterly meetings at resort

destinations and expensive hotels during peak times of the year, including meetings in

and traveled to such locations as Hawaii, Beverly Hills, and Martha's Vineyard.

75.      The Board of Trustees was presented with a schedule of bills paid by the

Fund regarding reimbursement for attendance at meetings and related expenses.  The

Trustees consistently approved the reimbursements.  They did not assess whether the

extravagant expenses for dinners, travel, and holiday parties were reasonable, necessary

to the administration of the Fund, or benefitted the Fund's participants and beneficiaries.

76.     The Fund's Trustees and staff and their families also accepted gratuities from the Fund's investment managers.

77.     The Fund's investment managers hosted and paid for dinners and parties at Board of Trustees meetings.  For example, on May 5, 2010, Benchmark Plus, an investment manager for the Fund, hosted and paid for a dinner in Honolulu, Hawaii for the Fund's Trustees and Fund employees and their families.

78.     The Fund's investment managers also hosted and paid for dinners for the Fund's Trustees, the staff, and service providers such as the Fund's counsel.  For example, on November 21, 2008, KRA and another investment manager for the Fund hosted a dinner for the Fund's Trustees and employees at the Bellagio Hotel in Las Vegas.

79.     The Fund Director also instructed Fund employees to contact the Fund's service providers and investment managers to solicit contributions to the Fund's holiday party raffle.  Investment managers, including Meketa, made contributions.

**Trebour Receives Compensation from the Fund**

80.     Trebour, a trustee, requested and received compensation from the Fund to travel to and attend Trustee meetings.

81.     The Trust Agreement states that the Trustees shall not receive compensation from the Fund "except as may be allowed by ERISA and as may be authorized by the remaining Trustees" and that "The Trustees shall establish the conditions for the payment of compensation (if any) and for the reimbursement of expenses."

82.     For Trebour's benefit, the Trustees entered into the IAM National Pension Fund Agreement For Compensation of Trustee (the "Compensation Agreement"),

effective October 1, 2004.   Mart signed the Compensation Agreement on behalf of the

union-side Trustees, and to avoid a conflict of interest, another employer-side trustee

signed instead of Trebour.

83.    The Compensation Agreement  states, in pertinent part:

> 4.  During the term of this Agreement, the Compensated
> Trustee will not receive any pay, fees, or any other
> compensation from an employer or association of
> employers whose employees are participants in the Fund or
> from an employee organization whose members are
> participants in the Fund.

84.    Trebour invoiced the Fund $250 per meeting and later $750 per day to

travel and attend meetings, including Investment Committee and Board of Trustee

meetings.  The Board of Trustees increased from one to four days the maximum number

of days that Trebour could be compensated per meeting.

85.    Contrary to the terms and conditions of the Compensation Agreement,

Trebour was receiving compensation from a contributing employer and from an employer

whose employees were participants in the Fund  (Port Imperial Ferry Corporation), and

also was receiving compensation from an employee organization whose members

participated in the Fund (the Union).

**Fiduciary Obligations Under ERISA**

86.    Also known as the prudence and loyalty requirements, the provisions of

ERISA § 404 require fiduciaries to:

(a) act solely in the interest of the participants and beneficiaries of the Plan

for the exclusive purpose of providing them benefits, as required by ERISA §

404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A);

(b)  act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, as required by ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B); and

(c)  act in accordance with the documents and instruments governing the Plan, as required by ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

87.  The strict liability provisions contained in ERISA § 406(b) prohibit fiduciaries from:

(1)  dealing with the assets of the Fund in their own interest or for their own account, in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1);

(2)  acting in transactions involving the Fund on behalf of a party adverse to the interests of the Fund or the interests of the participants or beneficiaries, in violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2); and

(3)  receiving consideration for his own personal account from a party dealing with the Fund in connection with a transaction involving assets of the Fund, in violation of  ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3).

### FIRST CLAIM FOR RELIEF
**(Against Trustees Roach, Allen, Tucker, Martinez, Gruber and Connery)**

88.  Pursuant to Rule 10(c), Fed. R. Civ. P., the Secretary adopts and incorporates by reference the averments and allegations of paragraphs 1 through 52 and 86 through 87 inclusive.

89.  Trustees Roach, Allen, Tucker, Martinez, Gruber and Connery constituted the six vote majority necessary to retain Graystone as the Fund's investment consultant.

90.     The Trustees caused the Fund to unnecessarily expend Fund assets on two sham searches for an investment consultant.

91.     The Trustees wasted Fund assets by instructing CIO Tarbox and his investment staff to conduct an RFP. When Tarbox eliminated Graystone from contention, the Trustees insisted that Graystone be given further consideration.  The Trustees ultimately ignored the recommendation of the Fund's CIO because he eliminated Graystone from consideration.

92.     The Trustees wasted Fund assets retaining the services of Gallagher to review and supplement Tarbox's RFP, and to recommend an investment consultant for the Fund.  When Gallagher reported that Graystone was near the bottom of the list of candidates, the Trustees insisted that Gallagher reconsider Graystone, interview Graystone and invite Graystone to make a presentation directly to the Board, thereby stripping the process of all neutrality and independence.

93.     When Gallagher continued to rank Graystone near the bottom of the list of candidates, Trustees Roach, Allen, Tucker, Martinez, Gruber and Connery ignored Gallagher's findings and selected Graystone as the Fund's investment consultant at a fee of $900,000 per year.  That amount was $125,000 per year more than the bid of Wurts & Associates, one of the highest ranked candidates and a firm recommended by both Tarbox and Gallagher.

94.     The Trustees' selection of Graystone was not based on a prudent and loyal process because they deliberately and knowingly disregarded the recommendations of the Fund's Chief Investment Office and the recommendation of an independent third-party reviewer, Gallagher, and in doing so wasted assets of the Fund.

95.     By this conduct, the Trustees demonstrated that they never intended to retain any firm other than Graystone for reasons other than the strict independent criteria relied upon by the Fund's CIO and the Fund's expert independent consultant.

96.     By their conduct described above, Trustees Roach, Allen, Tucker, Martinez, Gruber and Connery breached their fiduciary duties of loyalty and prudence, in violation of ERISA §§ 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B).

97.     Pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a), Trustees Roach, Allen, Tucker, Martinez, Gruber and Connery are jointly and severally liable for any losses that the Fund incurred as a result of their conduct and are subject to appropriate equitable and remedial relief, and they are subject to injunctive and other appropriate equitable relief under ERISA § 502(a)(5), 29 U.S.C. § 1132(a)(5).

## SECOND CLAIM FOR RELIEF
### (Co-Fiduciary Liability Against Trustees Roach, Gruber, Tucker, Martinez, Allen and Connery)

98.     Pursuant to Rule 10(c), Fed. R. Civ. P., the Secretary adopts and incorporates by reference the averments and allegations of paragraphs 1 through 52 and 86 through 97 inclusive.

99.     Trustees Roach, Gruber, Tucker, Martinez, Allen and Connery, each of whom was an ERISA fiduciary, knowingly participated in each other's breach of fiduciary duties with respect to the selection of Graystone as the Fund's General Investment Manager.  Therefore, they each are liable as co-fiduciaries for the breaches of each other, pursuant to ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1).

100.    Trustees Roach, Gruber, Tucker, Martinez, Allen and Connery, by failing to comply with their own ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and

(B), responsibilities of loyalty and prudence, enabled their co-fiduciaries to commit fiduciary breaches in connection with Fund assets.  Trustees Roach, Gruber, Tucker, Martinez, Allen and Connery knew of each other's fiduciary breaches and failed to take reasonable steps to remedy them.  Therefore, they each are liable as co-fiduciaries for the breaches of each other, pursuant to ERISA §§ 405(a)(2) and (3), 29 U.S.C. §§ 1105(a)(2) and (3).

## THIRD CLAIM FOR RELIEF
### (Against Trustees Trebour and Mart)

101.    Pursuant to Rule 10(c), Fed. R. Civ. P., the Secretary adopts and incorporates by reference the averments and allegations of paragraphs 1 through 87 inclusive.

102.    Trebour and Mart, as Co-chairs of the Board of Trustees and the members of the Fund's Investment Committee, failed to use a competitive search and bidding process in contravention of the Fund's Manager Monitoring Policy, when retaining service providers and investment managers for the Fund.

103.    Trebour and Mart hired Meketa (for Private Markets), KRA (for Global REIT), and Cliffwater (for Hedge Funds) as investment managers with no search, bidding, or competitive hiring process.  Trebour and Mart also hired Meketa to expand the Alternative Investment Program and develop the Concentrated Managers Program, and hired Segal Advisors to monitor Meketa, with no search, bidding, competitive hiring process, or fee analysis.

104.    In addition, Trebour and Mart created a conflict of interest when they retained Meketa to act both as an investment manager of the Private Markets portfolio as well as the Fund's investment consultant.  Trebour and Mart created a conflict whereby

they placed Meketa in a position to affect its own compensation from the Fund.  Trebour

and Mart also caused the Fund to incur additional fees and costs by hiring Meketa

because of the additional monitoring necessary as a result of Meketa's conflicts.

105.    Trebour and Mart also caused the Fund to pay additional fees and costs to

retain Segal Advisors to conduct due diligence and monitoring on Meketa.  Segal

Advisors had a direct financial interest in Meketa being retained as investment manager –

a $470,000 per year monitoring fee.  Trebour and Mart knew that the due diligence

process of Segal Advisors, therefore, could be compromised and unreliable.

106.    By the conduct described above, Trebour and Mart breached their duties of

loyalty, prudence, and adherence to the Fund's governing documents, in violation of

ERISA §§ 404(a)(1)(A), (B), and (D), 29 U.S.C. §§ 1104(a)(1)(A), (B) and (D).

107.    Pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a), Trebour and Mart are

jointly and severally liable for any losses that the Fund incurred, are liable to disgorge

any profits that they received, as a result of their conduct and are subject to appropriate

equitable and remedial relief, and they are subject to injunctive and other appropriate

equitable relief under ERISA § 502(a)(5), 29 U.S.C. § 1132(a)(5).

## FOURTH CLAIM FOR RELIEF
### (Co-Fiduciary Liability Against Trustees Trebour and Mart)

108.    Pursuant to Rule 10(c), Fed. R. Civ. P., the Secretary adopts and

incorporates by reference the averments and allegations of paragraphs 1 through 87 and

102 through 107 inclusive.

109.    Trustees Trebour and Mart, who were ERISA fiduciaries, knowingly

participated in each other's breach of fiduciary duties with respect to the selection of

Meketa (for Private Markets), KRA (for Global REIT), and Cliffwater (for Hedge Funds)

as investment managers for the Fund, and with respect to the hiring of Segal Advisors to conduct due diligence on and monitor Meketa.  Therefore, they each are liable as co-fiduciaries for the breaches of each other, pursuant to ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1).Trustees Trebour and Mart, by failing to comply with their own ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), responsibilities of loyalty and prudence, enabled their co-fiduciaries to commit fiduciary breaches in connection with Fund assets.  Trustees Trebour and Mart knew of each other's fiduciary breaches and failed to take reasonable steps to remedy them.  Therefore, they each are liable as co-fiduciaries for the breaches of each other, pursuant to ERISA §§ 405(a)(2) and (3), 29 U.S.C. §§ 1105(a)(2) and (3).

### FIFTH  CLAIM FOR RELIEF
**(Against Trustees Mart, Trebour, Nelson, Tucker, Gruber, Roach and Allen)**

110.    Pursuant to Rule 10(c), Fed. R. Civ. P., the Secretary adopts and incorporates by reference the averments and allegations of paragraphs 1 through 87 inclusive.

111.    The Trustees authorized the hiring of the Fund's service providers Meketa, KRA, and Cliffwater with no search or competitive bidding process and no analysis of the reasonableness of their fees.  They failed to prudently select the Fund's service providers, failed to comply with the Fund's Manager Monitoring Policy, and caused and permitted service providers to operate under conflicts of interest.

112.    The Trustees permitted Fund staff and Fund Trustees to expend Fund assets on lavish dinners, parties and travel.  They accrued expenses that were unreasonable and unnecessary to the administration of the Fund and did not benefit the Fund's participants and beneficiaries.  They were responsible for monitoring and

controlling the Fund's expenses but utterly failed to do so. They also failed to stop the practice of having investment managers host and pay for dinners and cocktail parties at Board of Trustees meetings.

113. They also improperly, and contrary to the Fund's Trust Agreement, permitted Trebour to receive fees to attend Trustee meetings.

114. By their conduct described above, the Trustees Trebour, Mart, Nelson, Tucker, Gruber, Roach, and Allen breached their fiduciary duties of loyalty, prudence, and adherence to Fund documents, in violation of ERISA §§ 404(a)(1)(A), (B) and (D), 29 U.S.C. §§ 1104(a)(1)(A), (B) and (D) and violated ERISA §§ 406(b)(1), (2) and (3), 29 U.S.C. §§ 1106(b)(1), (2) and (3) in spending unreasonable fees on parties and travel.

115. Pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a), Trustees Trebour, Mart, Nelson, Tucker, Gruber, Roach, and Allen are jointly and severally liable for any losses that the Fund incurred, are liable to disgorge any profits that they received, as a result of their conduct and are subject to appropriate equitable and remedial relief, and they are subject to injunctive and other appropriate equitable relief under ERISA § 502(a)(5), 29 U.S.C. § 1132(a)(5).

**SIXTH CLAIM FOR RELIEF**
**(Co-Fiduciary Liability Against Trustees Mart, Trebour, Nelson, Tucker, Gruber, Roach and Allen)**

116. Pursuant to Rule 10(c), Fed. R. Civ. P., the Secretary adopts and incorporates by reference the averments and allegations of paragraphs 1 through 87 and 111 through 115 inclusive.

117. Trebour and Mart, each of whom was an ERISA fiduciary, knowingly participated in each other's breaches of fiduciary duties. Therefore, they each are liable

28

as co-fiduciaries for the breaches of each other, pursuant to ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1).

118.    Trebour and Mart, by failing to comply with their own ERISA § 404(a) fiduciary responsibilities of loyalty, prudence, and adherence to plan documents, enabled their co-fiduciaries to commit fiduciary breaches in connection with Fund assets. Therefore, they each are liable as co-fiduciaries for the breaches of each other, pursuant to ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2).

119.    Trebour and Mart knew of each other's fiduciary breaches and failed to take reasonable steps to remedy them.  Therefore, they each are liable as co-fiduciaries for the breaches of each other, pursuant to ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3).

120.    Trustees Trebour, Mart, Nelson, Tucker, Gruber, Roach, and Allen, by failing to fulfill their ERISA § 404(a) duties to loyally and prudently select and monitor the Fund staff and other Fund fiduciaries, enabled one or more of their co-fiduciaries to commit fiduciary breaches. Therefore, they are liable as co-fiduciaries under §§ 405(a)(2) for the breaches of fiduciary duty committed by each other and all of their co-fiduciaries as described above.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Secretary of Labor prays that this Court enter an order:

1.    Requiring Defendants to restore to the Fund any losses that the Fund suffered and to disgorge any fees, salaries, compensation, and any financial benefits they realized as a result of the violations described in the Complaint;

2.    Requiring the Fund to implement reforms to ensure that the wrongdoing alleged in this Complaint does not recur;

3.      Enjoining Defendants from further violations of ERISA; and

4.      Granting such other relief as may be equitable, just, and proper.

Dated: January 24, 2016                  **For the Secretary of Labor**:

                                          M. PATRICIA SMITH
                                          Solicitor of Labor

                                          G. WILLIAM SCOTT
                                          Associate Solicitor of Labor
                                          Plan Benefits Security Division

                                          LESLIE C. PERLMAN
                                          Counsel for General Litigation

                                          /s/ *WAYNE R. BERRY*
                                          WAYNE R. BERRY
                                          Senior Trial Attorney
                                          DC Bar # 429661
                                          ERIC C. LUND
                                          DC Bar # 450982
                                          EIRIK J. CHEVERUD
                                          NY Bar # 4998563
                                          Trial Attorneys
                                          U.S. Department of Labor
                                          P.O. Box 1914
                                          Washington, D.C.  20013
                                          berry.wayne@dol.gov
                                          lund.eric@dol.gov
                                          cheverud.eirik@dol.gov
                                          (202) 693-5600